UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

UNITED STATES OF AMERICA,       )
                                )
        Plaintiff,              )
                                )
    vs.                         )       Case No. 4:09CR00193 ERW
                                )
BYRON ANTHONY WRIGHT,           )
                                )
        Defendant.              )

## MEMORANDUM AND ORDER

This matter comes before the Court on the Order and Report and Recommendation of

United States Magistrate Judge Mary Ann Medler [doc. #38], pursuant to 28 U.S.C. § 636(b).

Defendant filed numerous pretrial motions in this case, including a Motion to Suppress

Evidence [doc. #22] and a Motion for a *Franks* Hearing [doc. #24].[1] Magistrate Judge Medler

issued an Order and Report and Recommendation, recommending that Defendant's Motion to

Suppress Evidence be denied and ordering that Defendant's Motion for a *Franks* Hearing be

denied. Defendant filed objections to a number of the findings of fact made by Magistrate Judge

Medler, and also objected to the Magistrate Judge's conclusions regarding Defendant's Motion to

---

[1] As noted by Magistrate Judge Medler, counsel for Defendant made mention of his intention to request a *Franks* hearing at the Evidentiary Hearing in this case. Following the hearing, counsel filed Document #24, which is a treatise for practitioners on "How to Get a *Franks v. Delaware* Hearing." There is no mention of the style of this case; there is no reference to the facts of this case; there is no signature of counsel. Upon being informed by the Government of this aberrant filing, counsel for Defendant neither responded nor asked to withdraw the treatise nor filed the proper motion for a *Franks* hearing. This Court agrees with Magistrate Judge Medler that the issue of a *Franks* hearing has not been properly presented to the court. However, like the Magistrate Judge, the Court will address the issue of a *Franks* hearing (upon which many of Defendant's Objections are based) in the interest of justice.

Suppress Evidence and Defendant's Motion for a *Franks* Hearing.  The Court concludes that the Magistrate Judge's findings were correct, and therefore adopts the Magistrate Judge's findings of facts and conclusions of law.

## I.    LEGAL STANDARD

"[W]hen a party objects to the report and recommendation of a magistrate judge concerning a dispositive matter, '[a] judge of the court shall make a de novo review determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  *United States v. Lothridge*, 324 F.3d 599, 600 (8th Cir. 2003) (*citing* 28 U.S.C. § 636 (b)(1)).[2]  The district court has wide discretion to "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1).

## II.    FINDINGS OF FACT[3]

The Evidentiary Hearing for this case was held on April 3, 2009 and on April 14, 2009, in front of Magistrate Judge Medler.  At the hearing, the Government presented the testimony of Detective Ronald Willenbrink, Detective Jeff Seerey, Police Officer Brian Hale, and DEA Agent Eric Lanham.  Defendant presented the testimony of Terry Peebles, Kathy Peebles, Eric Petty, and Peter Doss.  In addition, Defendant himself testified.

---

[2]28 U.S.C. § 636(b)(1)(B) provides that "a judge may also designate a magistrate judge to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition, by a judge of the court . . . ."  The statute further provides that each party may file written objections within ten days of being served with a copy of the magistrate judge's report and recommendation.  *Id.* § 636(b)(1).

[3]The Court's findings of fact are taken largely from Magistrate Judge Medler's Order and Report and Recommendation [doc. #38], while taking into consideration the Objections made by Defendant.

**A.      TESTIMONY OF DETECTIVE RONALD WILLENBRINK AND INFORMATION CONTAINED IN HIS AFFIDAVIT**

Detective Ronald Willenbrink has been a police officer with the City of St. Ann, Missouri for three and one half years.  In mid-October, 2008, he was assigned to the North County M.E.G. Unit, which is composed of a group of undercover drug agents and investigators.  On October 28, 2008, as part of an investigation of Defendant, Detective Willenbrink applied for a search warrant for Defendant's residence at 8037 Schoolway in Kinloch, Missouri.  He and Detective Davis presented an application and supporting affidavit for the search warrant to the Honorable Judy Draper of the St. Louis County Circuit Court.  Because Detective Willenbrink had only been assigned to the M.E.G. Unit in mid-October, 2008, this was one of the first cases on which he worked.  The affidavit in support describes Defendant's residence with particularity and relates Detective Willenbrink's training and experience.[4]  It states that in October of 2008, the affiant received information from a reliable confidential informant ("CI") that a subject named Byron Wright was selling rock cocaine from his residence located at 8037 Schoolway, St. Louis County, Missouri 63140.  The affidavit goes on to say that a record check of Byron Wright revealed prior arrests for Unlawful Use of a Weapon, Possession of Stolen Property, Possession of a Controlled Substance, Domestic Assault Third, Sales of Imitation Controlled Substances, Possession of a Short-Barreled Weapon, DWI, and numerous arrests for Failure to Appear.

The affidavit states that in October of 2008, the affiant, along with other agents of the North County M.E.G. Unit, conducted surveillance of Byron Wright's residence.  During the course of the investigation, at various times of the day and night, the affiant observed

---

[4]The affidavit (Govt.'s Ex. 1) is incorporated by reference as if fully set out herein.

circumstances that paralleled that of a "drug house" in which numerous vehicles arrived at the residence at all hours of the day and night for short intervals of time. The affidavit continues that "within the past twenty-four hours," the affiant was contacted by a CI advising him that he/she had just left the resident at 8037 Schoolway. The CI advised the affiant that while inside the residence, he/she observed a large amount of cocaine in the back room of the residence. The CI further said that he/she told Byron Wright that he/she "was gonna get their money and be back." The CI advised that Byron Wright stated to him/her, "whenever, I'll be here." The affidavit states that the informant, who has proved to be accurate and reliable, has provided the affiant with information that has led to the arrest of numerous individuals for narcotics and weapons violations.[5]

Based on the information in the affidavit, Judge Draper found probable cause to believe that cocaine and paraphernalia used in the use and distribution of controlled substances, papers reflecting the sale of controlled substances and United States currency derived from the sale of controlled substances would be found at Defendant's residence. She signed the search warrant at 3:53 p.m. on October 28, 2008.[6]

---

[5]Defendant objects to this portion of the Report and Recommendation, noting that "this matter was reviewed thoroughly in cross-examination and demonstrated not to be true." (Def.'s Objections, doc. #40, p.2). Defendant's objection overlooks the first portion of the sentence, namely, "The affidavit states that . . . ." This language indicates that the Magistrate Judge and this Court are merely finding that the affidavit *included* this statement, not passing judgment on the veracity of the claim. Moreover, the issue of whether the CI had previously provided Detective Willenbrink with information and what impact this has on the search warrant is addressed later in the analysis.

[6]Judge Draper accidently and mistakenly signed the blank return "10/28/08 at 3:53 p.m." The return was actually made several days later, listing the items seized. (Govt. Ex. 2).

Detective Willenbrink testified that after Judge Draper signed the search warrant, Detective Davis used his Nextel phone to alert the other members of the Unit (who were still surveilling Defendant's residence) that the search warrant had been signed. Detective Willenbrink and Detective Davis left Judge Draper's chambers, went to the Clerk's Office and filed the search warrant. Detective Willenbrink testified that while they were in the Clerk's Office, members of the Unit called to say that Defendant was leaving the residence. The detectives then dropped off a copy of the search warrant at the prosecutor's office and then responded to Defendant's residence on Schoolway. Detective Willenbrink arrived at approximately 4:15 p.m, and the residence had already been secured. The canine responded and alerted at the bedroom closet and at a safe in the basement. Detective Willenbrink took photos of marijuana in cellophane bags found in the garage (Def.'s Ex. C) and of marijuana in a mason jar found in the bedroom (Def.'s Ex. D).

Detective Willenbrink prepared a draft of the police incident report regarding this case (Def.'s Ex. A). It was the first report he had prepared as a member of the M.E.G. Unit. Because he was a novice and new to the Unit, when his supervisors reviewed the draft, they made several changes. For example, Detective Willenbrink mixed-up Agents Lanham and McKnight because he did not know them. Detective Willenbrink then prepared the final report (Def.'s Ex. B). This Court agrees with the Magistrate Judge's characterization of the cross-examination of Detective Willenbrink regarding his testimony and the language in the draft and the final report as being inordinate in length. This Court also agrees that, for the most part, the differences are semantic and irrelevant[7] and do not suggest that Detective Willenbrink was acting in bad faith. The only

---

[7]For example, the final report adds the words "shortly after" in paragraph four; both the draft and the final report say that Detective Willenbrink notified the Unit that the warrant was signed whereas he testified that Detective Davis did the notifying; the draft says that officers

issues that require addressing are, first, that the search warrant says it was signed at 3:53 p.m., while Detective Willenbrink's draft report says it was presented to Judge Draper at "approximately 15:50 hours" (3:50 p.m.) and that at 15:50 hours (3:50 p.m.), Detective Willenbrink notified the agents it was signed. This Court finds that this minor discrepancy does not discredit Detective Willenbrink's testimony that the other members of the Unit were not notified that the search warrant had been signed until it was actually signed. It is important to remember that Detective Willenbrink's draft report said *approximately* 15:50 hours, not precisely or exactly. Moreover, the time displayed on one clock or watch is often different from the time displayed on another clock or watch. This may account for some of the time differential. In any event, this minor time difference is irrelevant to the issues in this case.

With regard to the CI, Detective Willenbrink was cross-examined extensively about the language in the draft and final version of the incident report. However, the reports are not at issue.[8] The affidavit in support of the search warrant is the crucial document. Detective Willenbrink testified that he has used the CI on two prior occasions, and on those occasions did not verify the information. Consistent with this testimony, paragraph five of the affidavit states that he was contacted by a CI; it does not say "reliable." Paragraph six of the affidavit says "This informant . . . has proven to be accurate and reliable" in the past. This is consistent with Detective Willenbrink's testimony that other members of the Unit had frequently used the CI and

_____

conducted surveillance, whereas the final report says surveillance was established; the draft says Defendant bumped Detective Seerey's chest, whereas the final report says that Defendant charged him, striking him in the chest; etc.

[8]As noted by Magistrate Judge Medler, cross-examination about the writing style used in police reports is unpersuasive at best. A draft is supposed to be corrected and improved, a fact that seems to be lost in this case.

with Detective Seerey's testimony that he used the CI all the time, found him/her reliable and talked to him/her almost every day. Paragraph six of the affidavit also says that the CI provided Detective Willenbrink with information that led to the arrest of numerous individuals. This statement is inaccurate in that the information that led to the arrest of numerous individuals was not provided to Detective Willenbrink *personally*. However, upon considering the information known by the other members of the Unit, it is clear that the statement that the CI provided information that led to the arrest of numerous individuals is factually accurate.[9]

## B.    TESTIMONY OF DETECTIVE JEFF SEEREY

Detective Jeff Seerey testified that he has been a police officer in the City of Florissant for five months, and prior to that, he was a Berkley police officer for eight years. He was assigned to the M.E.G. Unit for four years. On October 28, 2008, he participated in the execution of the search warrant at 8037 Schoolway. Regarding the CI referred to in the affidavit, Detective Seerey testified that he has used the CI for three to four years and he/she has provided information that has proven to be reliable. Detective Seerey said that he was in constant contact with the CI, that he spoke to him/her almost every day for years, and that all the officers in the M.E.G. Unit used this CI. Detective Seerey testified that the CI had told him numerous times that there were drugs in Defendant's house.

---

[9]Defendant objects to the Magistrate Judge's finding that "[a]lthough the information was not provided to Det. Willenbrink personally, clearly the statement is accurate if the information known to the other members of the Unit is attributed to him." (R&R, doc. #38, p.6). Defendant argues that "the Affidavit never attributed the knowledge of the entire M.E.G. Unit to what was being sworn to, but personalized the information as that <u>solely</u> of the Affiant." (Def.'s Objections, doc. #40, p.4). The Court will address the issue of attribution of knowledge in a subsequent section.

On October 28, 2008, Detective Seerey was one of the officers surveilling Defendant's residence.[10] The officers were all in contact with Detective Willenbrink and Detective Davis by means of their "direct connect" Nextel phones, which can function like a walkie-talkie. Detective Seerey did not recall whether it was Detective Willenbrink or Detective Davis who made the "all call" notification that the search warrant was signed. Detective Seerey testified that after they received notification that the warrant had been signed, he observed Defendant leave his residence and get into the passenger side of a vehicle and drive away.[11] Terry Peebles was the driver of the vehicle. Detective Seerey and another officer followed Mr. Peebles and Defendant. They stopped the vehicle about two or three blocks away, at the corner of Martin Luther King and Wesley. Detective Seerey approached Defendant on the passenger side, while another officer approached Mr. Peebles. Defendant was not being cooperative, so Detective Seerey handcuffed him. Defendant was extremely hostile, using profanity, and yelling "there's not f---ing reason for this stop." Detective Seerey did a leg sweep and put Defendant on the ground. Detective Seerey tried to calm Defendant down and said, "We're going to execute a search warrant at your house; I'll explain this on the way back to your house." Detective Seerey testified that there was no

---

[10]Defendant objects to the Magistrate Judge's statement that Defendant Seerey was one of the officers surveilling Defendant's residence. He argues that "it was obvious that Detective Seerey was more than a 'surveilling officer' in this instance." (Def.'s Objections, doc. #40, p.4). It may be true that Detective Seerey had a more significant role in the investigation, but this does not negate the fact that he was one of the officers engaged in conducting surveillance of Defendant's residence on October 28, 2008.

[11]Defendant objects to the conclusion that Detective Seerey observed Defendant leave his residence after the search warrant was signed. He argues that "the record is anything but clear about when phone calls were made and to whom they were made." (Def.'s Objections, doc. #40 p.4). This Court thoroughly reviewed Detective Seerey's testimony and concludes that he clearly testified that he had been notified that the search warrant was signed before he observed Defendant leaving his residence. (April 3, 2009 Transcript, doc. #44, p.87 l.11-p.88 l.10).

traffic offense, but he had probable cause to stop and arrest Defendant, based on the information contained in the signed search warrant. Detective Seerey could not recall if Mr. Peebles was on his cell phone during this period of time. Defendant was detained no longer than two or three minutes and it took only one minute or one and a half minutes to get back to his house. When they arrived back at Defendant's residence, Detective Seerey and Defendant remained in the car for a short period of time. Detective Seerey observed that another car had arrived while he was gone. It was determined that the car belonged to Peter Doss, Defendant's father.

The Government played a CD of the regular audio traffic between Detective Seerey and his Berkley dispatcher. It memorializes the call in which Detective Seerey says they were ready to execute the search warrant and wanted Berkley officers in uniform with marked cars to respond. The M.E.G. Unit officers wear civilian clothes and their vehicles are unmarked. The time of the call is Tuesday, October 28, 2008, at 4:06 p.m.

Detective Seerey waited outside in his car with Defendant. According to Detective Seerey's testimony, after the search warrant was signed, a protective sweep of the residence was done to assure there was nothing to harm the officers and the drug canine. It is M.E.G. Unit policy to have a drug canine sweep the house before the actual search in order that the search may be more focused. Other than the protective sweep, which is not an actual search, no search was done prior to the sweep by the canine. Following the canine sweep, Defendant was brought inside, where he sat on a couch in the living room. Detective Seerey did participate in the search, but any evidence of significance was found by the other officers. No cocaine was found in the back room where the CI indicated it would be.

### C.    TESTIMONY OF POLICE OFFICER BRIAN HALE

Brian Hale has been employed as a police officer in the City of Hazelwood for fifteen years. He has been a canine officer for nine years. On October 28, 2008, he was called on his cell phone at home and was requested to make a sweep with his dog. He was off duty at that time. After the call, it took him five or six minutes to get his dog's water bowl and other items. As he pulled out of his driveway, he called his dispatcher, who logged him out. Police Officer Hale's log (Govt.'s Ex. 4) shows that he was dispatched at "16:19:04" or 4:19 p.m. It took five to ten minutes to get to Schoolway. Upon arriving at the house, it did not appear that any search had taken place, as the house was very clean. Officer Hale did an initial protective sweep of the house before he brought in the dog. The dog alerted in a back bedroom on the first floor, at a safe in the basement, and at a mason jar of marijuana. Police Officer Hale did not recall an alert in the garage.

Officer Hale testified that he had worked with the M.E.G. Unit before, but had no prior involvement with the instant case. He said that it is routine to bring in a canine before a search warrant is executed. When or if the dog alerts, Police Officer Hale then tells the officers to secure the area and to not disturb the odors.

### D.    TESTIMONY OF DEA AGENT ERIC LANHAM

Eric Lanham has been a Detective in the City of Bridgeton for fifteen years. For approximately five years, he has been assigned as a DEA Task Force Agent. He did not take part in the execution of the search warrant on October 28, 2008 at the residence on Schoolway, but he came in to interview Defendant at the Bridgeton Police Department. Members of the M.E.G. Unit were there and gave Agent Lanham a synopsis of what had taken place. He met with

Defendant in an interview room. They began by talking about high school because they had gone to high school together. They talked about people that they knew. Agent Lanham asked Defendant about the items seized and Defendant said "I'm not a snitch" and that he would take responsibility. Agent Lanham gave Defendant a Waiver of Prompt Presentment form (Govt.'s Ex. 3), so as not to hold Defendant over night. The form says:

Prompt Presentment Waiver Form

I have been advised of my right to remain silent and that anything I say can and will be used against me. I realize that I have the right to an attorney to advise me before and during any questioning, and I understand that if I cannot afford an attorney, one will be appointed for me.

I realize under the Federal Rules of Criminal Procedure I have the right to be brought before a judge without unnecessary delay.

I have agreed to cooperate with [Eric Lanham] of the [DEA] and I hereby waive my right to be presented without delay to a judge.

My signature here signifies my willingness to waive those rights.

Agent Lanham asked Defendant to read the form and Defendant said he did not want to sign anything without first talking to his attorney. Defendant gave Agent Lanham the phone number of Anthony Winfield and Agent Lanham called Mr. Winfield on his cell phone. Agent Lanham told Mr. Winfield the nature of the case. Mr. Winfield said he did not handle federal matters, however, he said he worked with Brad Kessler. Agent Lanham explained the Prompt Presentment Form, Mr. Winfield spoke to Defendant and then Defendant signed the form. It is signed by "Byron Wright" and "Eric Lanham," and both signatures are dated October 28, 2008.

Agent Lanham asked Defendant if he wanted to make any statements after talking to his attorney and Defendant said, "I'm a man. I take responsibility for my own actions." No threats or promises were made to induce Defendant to sign the form or to make a statement. Defendant was booked, then released.

### E.    TESTIMONY OF TERRY PEEBLES

Defendant called Terry Peebles to testify.  Mr. Peebles is self-employed and has owned a tree service for seventeen years.  He testified that he has no felony convictions.  He has known Defendant as an employee and friend for twenty-five years; they grew up together.  Mr. Peebles testified that he was at Defendant's house on October 28, 2008.  He testified that at around 3:15 or 3:20 p.m., Defendant entered his truck and they drove away.  He then testified that about three minutes later they were stopped by two white police officers, one of whom went to Defendant's side (the passenger side), and the other went to Mr. Peebles' side (the driver's side).[12]  The officers were not in uniform, but they both had guns drawn.  Mr. Peebles testified that the officer who approached him used profanity and racial slurs, asked for his ID, and ordered him out of the truck, all without giving him an explanation.  The other officer also used profanity and racial slurs, directed towards Defendant.  This other officer "put [Defendant] down" and snatched his keys from his pocket.  The officers told Mr. Peebles to go on his way.  Mr Peebles said that the stop took approximately ten minutes, and that he was not on his cell phone before or during the stop. After they let him go, Mr. Peebles called his wife, drove a few blocks and spoke in person with his cousin Keith Conway (the mayor of Kinloch) for about three minutes at a social club on Martin Luther King.  Mr. Peebles said that after he spoke to his cousin, he went back to Defendant's house.  When he arrived, there were officers in the house and officers in uniform on the porch. The officers used more profanity and told Mr. Peebles to leave.  He did so.

---

[12]Terry Peebles testified that the stop was at Granberry and Martin Luther King, not Wesley and Martin Luther King, as Detective Seerey testified.

Defendant's Exhibit I is a list of cell phone calls made by and to Mr. Peebles.  On October 28, 2009, the relevant calls are:

| | | | |
|---|---|---|---|
| 3:38 p.m. | 578-2802 | call to wife | 1 minute |
| 3:39 p.m. | 636-528-0090 | call to Troy, Missouri | 1 minute |
| 3:48 p.m. | 578-2802 | incoming call from wife | 7 minutes |
| 3:56 p.m. | 578-2802 | call to wife | 2 minutes |
| 4:15 p.m. | 766-9408 | call to cousin Enoch Peebles | 2 minutes |
| 4:18 p.m. | 766-9408 | call to cousin Enoch Peebles | 2 minutes |
| 4:58 p.m. | 723-1554 | call to St. Louis (?) | 1 minute |
| 5:17 p.m. | 766-9408 | call to cousin Enoch Peebles | 1 minute |

Mr. Peebles testified that after the police officers let him go, he called his wife to let her know what was happening.  This was at 3:38 p.m.  He said that she did not answer the phone, so he tried their home phone number, 636-528-0090.  This was the call recorded at 3:39 p.m.  The 3:48 p.m. call from his wife came as he was driving back to Defendant's house.  The 3:56 p.m. call to his wife came as he was walking up to Defendant's house.  He testified that he did not think he actually spoke to her then, rather, he left a voicemail message because he had previously told her he would call her back to discuss their son.  The 4:15 p.m. call to his cousin Enoch Peebles concerned some landscaping he was going to do for him the following day.  The 4:18 p.m. call to his cousin Enoch Peebles was for the purpose of setting up a meeting to discuss the cousin's divorce.

## F.    TESTIMONY OF KATHY PEEBLES

Kathy Peebles testified that she is married to Terry Peebles.  She has known Defendant for nineteen years.  She testified that the 3:38 p.m. call was from her husband to her cell phone, but she missed the call.  The 3:39 p.m. call was from her husband to the home land line, but she did not hear the phone ring.  She said she called her husband back at 3:48 p.m. and he told her that he

had been pulled over and he described the encounter to her. She said he was upset and bothered. She was concerned about their son, so she called him back at 3:56 p.m. On cross examination, and after viewing the phone records, she said that her husband called her at 3:56 p.m.

### G.    TESTIMONY OF ERIC PETTY

Eric Petty testified that his house is behind Defendant's house and his property runs from Courtney to Schoolway. On October 28, 2008, he got off work early, and at approximately 3:00 p.m., he and Teresa McCray were cleaning up debris from a walnut tree close to Schoolway. He saw Defendant leave in Terry Peebles' truck at 3:10 p.m. and after approximately five minutes, he saw Defendant's dad, Peter Doss, drive up to Defendant's house and go inside. At 3:25 or 3:30 p.m., other vehicles with tinted windows arrived and drove up on Defendant's lawn. One of the men tossed keys to another and they all went in the house. Then, the Berkley Police came. Mr. Petty testified that Peter Doss left, and at 4:10 or 4:15 p.m., a Dodge Charger arrived and the occupants had a brown envelope. They went into the house. At 4:35 p.m., the Hazelwood Police brought the drug canine and they stayed until approximately 5:30 p.m. At about 4:35 or 4:45 p.m., Mr. Petty spoke to Terry Peebles, who was parked in his driveway. Mr. Petty said that he recalls the times so clearly because he was looking at his watch and he has a good memory.

### H.    TESTIMONY OF PETER DOSS

Peter Doss is Defendant's father. He lives in Detroit, Michigan. On October 28, 2008, he was in St. Louis for an annual party at the Kinloch Athletic Club, and to visit his son. At approximately 3:00 p.m., he was visiting with his friend who works as a crossing guard. The two men were planning to pick up supplies for the party. The guard said that school got out at 3:15 p.m., and it would take him about thirty minutes to get all of the children across the road safely.

The guard told Mr. Doss that he could be ready to go to the store at approximately 3:45 p.m. Mr. Doss left and went to Defendant's house, which was about five minutes away. He said that he arrived by 3:15 p.m. or before. He let himself in with his key and started fixing something to eat.

The doorbell rang a little after 3:15 p.m., approximately five minutes or less after he arrived. Mr. Doss answered the door and two white police officers in plain clothes with guns drawn were at the door. One appeared to be putting a key in the lock. The officer showed his badge and told Mr. Doss to open the door. The officer unlocked the storm door with a key and pulled Mr. Doss out of the house by his belt. The officers went inside and Mr. Doss remained on the porch. Then they brought Defendant into the house. After about thirty minutes, Mr. Doss heard someone say, "Whose weed is this?" and Mr. Doss went to the door and said, "That's mine." Mr. Doss said that the marijuana was in a drawer in the back bedroom where he stayed. He also had some marijuana in a jar in a shoe box in the closet. The officer put the marijuana, which was in a plastic bag, on the coffee table in the living room. The officers said, "Do the police in Detroit let you have weed?" and Mr. Doss said, "It's not lawful." The officer told a uniformed officer to search Mr. Doss's car, and if he found nothing, to "get him outa here." They found nothing in the car and told Mr. Doss to leave. Mr. Doss said, "Could I have my weed?" and the officers said, "Go buy some." Mr. Doss left, got his friend, and went to the store to buy party supplies. When he returned at 5:30 or 6:00 p.m., the officers were still there. Mr. Doss said that he did not see a dog the entire time he was there.

# I.    TESTIMONY OF DEFENDANT BYRON WRIGHT[13]

Defendant testified that on October 28, 2008, he and Terry Peebles left 8037 Schoolway at 3:15 or 3:20 p.m.  Officers then stopped Mr. Peebles' truck a short distance away.  An officer tapped on his window with a gun, but did not show a badge.  The officer "threw" Defendant up on the side and searched Mr. Peebles' vehicle.  Defendant testified that the officer tried to slip something into Defendant's pocket, but Defendant pushed it out.  The officer said, "We've got a warrant."  The officer then handcuffed Defendant and threw him to the ground.  Defendant said that he did not charge the officer or push him, but they were cursing each other.  The officer searched Defendant, took his keys, put Defendant in one of the police vehicles, and returned to Defendant's house.  Defendant was in the car when he saw his father come to the door and the officer put a key in the door and sat his father down on the porch.  Then the officer took Defendant into the house and threw him on the couch.  Other officers searched the residence. They said they found a gun and a mason jar in a box and a big bag of weed.  These items and $400.00, which was on Defendant's person, were put on the table.  It was approximately 3:30 p.m. at this time.  Defendant sat on the couch for about forty-five minutes before other officers arrived with the search warrant.  After the dog arrived, they made everyone leave the house so the dog could search.  One officer came outside and said, "Open the safe or I'll blow your head off." They changed Defendant's handcuffs to the front and he opened the safe.  Inside the safe was the

---

[13]Defendant objected to the Court's "characterization of Byron Wright's testimony on Pages 13 and 14 of the Report and Recommendation," stating that it "essentially has been disregarded by the Court and given no weight or value."  On pages 13 and 14 of the Report and Recommendation, the Magistrate Judge merely reiterates the testimony given by Defendant at the evidentiary hearing.  The Magistrate Judge did not pass judgment on the testimony in these paragraphs or suggest that the testimony would be disregarded.  Thus, Defendant's objections to pages thirteen and fourteen are rejected by this Court.

following: powdered cocaine, crack, a digital scale, gloves, safety masks, and either $21,481.00 or $22,500.00. Defendant said that only $10,000.00 of it came from selling drugs; the rest was from a home equity loan. He did not know if there was ammunition and a loaded .357 in the safe, but he said he had a gun in his room and one in his closet locked up. He testified that the gun in the photo was not in the safe.

Defendant testified that no one had ever been to his house to buy drugs and that he had never sold drugs from the house. He said that there were never any drugs in the bedroom. Defendant said that when he sold cocaine and crack, he would go to the buyers' houses or he would sell from his car. He did not know the names or addresses or cell phones of any of his buyers. He said that they "stay all over." He said that he sold to four or five people whenever they would call, probably once a month, and he charged $1,200.00 an ounce. He admitted that if someone said he had cocaine and crack in the house twenty-four hours prior to October 28, it would be a correct statement. He said that he obtained his cocaine from "this one guy," but he did not recall his name or how he was able to reach him. He also said he got it from more than one person, "whoever had it." However, he did not recall the names, addresses or phone numbers of these persons.

Defendant testified about his criminal history. He said that he had no convictions, but that in 1992, he pled guilty to Unlawful Use of a Weapon. He said he was young and did not know any better and did not know he could get a lawyer. He also pled guilty to Attempt Delivery/Manufacture of Imitation Controlled Substance, but said he was not guilty. He was arrested by the SCAT Team and said that, "If they were around, you got locked up." He had a public defender for that case, did not recall if he was under oath, and did not recall all of the

questions he was asked. He said he did not lie to the judge, but he pled guilty even though he was not guilty. He said it was better to take a lesser charge and move on, and that he did not know any better.

Defendant testified that when he arrived at the police station, Eric Lanham came in and said, "Byron, remember me? I went to high school with you." Defendant said he did not remember him, and that they went to grade school together when they were only eight or nine years old. Agent Lanham gave Defendant the Prompt Presentment Form and called the lawyer for him. Defendant talked to the lawyer, who told him to sign the form. Defendant testified that he does not read very well, but admitted to signing the form. Agent Lanham asked if he wanted to cooperate and Defendant said, "no." He testified that he did not say, "I'll take responsibility for what's mine."

## III.    DISCUSSION

### A.    MOTION FOR A *FRANKS* HEARING

Defendant did not object to Magistrate Judge Medler's finding that the search warrant was facially valid because probable cause existed to believe that evidence of drug dealing would be found at Defendant's residence. The Court has reviewed Magistrate Judge Medler's probable cause analysis, finds it to be correct, and adopts it in its entirety. Defendant does, however, make numerous objections with respect to the Magistrate Judge's *Franks* hearing analysis. This Court will now take up those objections.

An affidavit supporting a warrant is generally presumed to be valid, however,

> "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to

the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request."

*United States v. Kattaria*, 553 F.3d 1171, 1176 (8th Cir. 2009) (quoting *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978)). Although no formal motion was filed, it is apparent that Defendant's request for a *Franks* hearing is based on the alleged falsity of three portions of the affidavit: paragraph six of the affidavit, because the affiant didn't have personal knowledge of the reliability of the CI; paragraph five of the affidavit, because cocaine and crack were not found where the CI said it would be; and paragraph two of the affidavit, because Defendant testified that he never sold drugs from his home. The Magistrate Judge rejected each of these arguments and denied Defendant's request for a *Franks* hearing.

Defendant's first objection deals with Officer Willenbrink's statement in the affidavit that the CI had provided him with information in the past that led to the arrest of numerous individuals. This statement was technically false because Officer Willenbrink did not have *personal* knowledge of the reliability of the CI. Thus, Defendant argues that Officer Willenbrink intentionally or recklessly included a false statement in his affidavit. This Court disagrees, and finds that Defendant has failed to demonstrate that Officer Willenbrink's statement, while technically untrue, was made intentionally or with reckless disregard for the truth. Officer Willenbrink was new to the M.E.G. Unit and did not have the opportunity to speak with the CI much in the past. However, Officer Willenbrink did talk to Detective Seerey, who provided information about the reliability of the CI. Detective Seerey was a reliable intermediary, as he testified that he had been in constant contact with the CI almost every day for three or four years and that the information provided by the CI was reliable. *See United States v. Gladney*, 48 F.3d

309, 313 (8th Cir. 1995) (finding that there was no *Franks* violation when affiant stated that he "received information" when another officer actually spoke to the CI; noting that "[t]his situation differs from cases in which informant information was relayed to the affiant at a later date through an unreliable intermediary").  Moreover, it is well established that a police officer is allowed to rely on the collective knowledge of his colleagues in deciding whether to seize evidence or make an arrest.  *United States v. Riley*, 927 F.2d 1045, 1049 (8th Cir. 1991) (citing *United States v. O'Connell*, 841 F.2d 1408, 1419 (8th Cir. 1988)).  Thus, this Court agrees with Magistrate Judge Medler and finds that Officer Willenbrink did not intentionally or recklessly make a false statement.

Next, Defendant objects to Magistrate Judge Medler's finding that even if the Court concluded that Officer Willenbrink intentionally or recklessly made a false statement about the CI, there would still not be a *Franks* violation because striking the offending portions does not eliminate probable cause. Because this Court has found that Officer Willenbrink *did not* intentionally or recklessly make a false statement, it is not necessary to determine whether the allegedly false statement was essential to the finding of probable case, as required by *Franks*. Nonetheless, the Court agrees with Magistrate Judge Medler's ultimate finding that probable cause still exists after the offending portion is stricken.  The statement at issue is Officer Willenbrink's statement in the affidavit that, "[t]his informant who has proven to be accurate and reliable has provided this affiant with information in the past that has lead to the arrest of numerous individuals for narcotics and weopons [sic] violations."   Magistrate Judge Medler only removed "the affiant" from the sentence, leaving the affidavit to read, "This informant who has proven to be accurate and reliable has provided . . . information in the past that has led to the

arrest of numerous individuals for narcotics and weopons [sic] violations." It is not clear to this Court if Magistrate Judge Medler removed enough of the statement; this Court believes that, if Officer Willenbrink's technically false statement were determined to be intentional or reckless, the Court would have to strike the entire false statement from the affidavit. *See, e.g.*, *United States v. Lakoskey*, 462 F.3d 965, 977 (8th Cir. 2006) (finding probable cause even when all information contained in an email was excluded); *United States v. Goodson*, 165 F.3d 610, 614 (8th Cir. 1999) (finding probable cause even when allegedly incorrect information provided by informants was excluded).

However, even if that entire statement were removed from the affidavit, probable cause would still exist. "'Probable cause to issue a search-warrant exists when the supporting affidavit sets forth sufficient facts to lead a prudent person to believe that there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Lakoskey*, 462 F.3d at 977 (quoting *United States v. Sundby*, 186 F.3d 873, 875 (8th Cir. 1999)). The affidavit states that: the affiant has experience in investigating controlled substance trafficking offenses; a reliable[14] CI told the affiant that Defendant was selling rock cocaine from his residence; Defendant has a criminal record; the affiant and other agents conducted surveillance of Defendant's house and they observed circumstances that parallel that of a drug house; and that less than twenty-four hours earlier, the CI had contacted the affiant and told him that he/she had observed a large amount of cocaine in the back room of Defendant's residence. This is sufficient to establish probable cause.

---

[14]It is permissible in this instance to state that the CI is reliable because the affiant does not attribute the statement to his personal knowledge.

Thus, Magistrate Judge Medler appropriately rejected Defendant's argument that Officer Willenbrink's statement in the affidavit entitled him to a *Franks* hearing.

Defendant also objects to Magistrate Judge Medler's finding with respect to paragraph five of the affidavit, that Defendant did not provide evidence that the cocaine was never in the bedroom to support his argument that the information was intentionally or recklessly misleading. Defendant argues that he testified that he didn't keep drugs in that portion of the house and that he only kept them in the safe. The Court initially notes that the credibility of Defendant's testimony is called into question, due to the incentive that he has to lie in attempt to avoid criminal charges. However, even if the Court were to assume the veracity of this testimony, it would not affect the Court's decision to reject Defendant's request for a *Franks* hearing. "To obtain a *Franks* hearing based simply on purported falsehoods of a confidential informant, the defendant must show that the confidential informant was in fact acting as a government agent." *United States v. Hollis*, 245 F.3d 671, 674 (8th Cir. 2001). "In determining whether a private citizen is an agent of the government, two critical factors are 'whether the government knew of and acquiesced in the intrusive conduct,' and 'whether the party performing the search intended to assist law enforcement officials or to further [the informant's] own ends.'" *United States v. Malbrough*, 922 F.2d 458, 462 (8th Cir. 1990) (quoting *United States v. Miller*, 688 F.2d 652, 657 (9th Cir. 1982)) (alteration in original). In this case, there is no evidence that the CI was acting as a government agent. Defendant offered no evidence to suggest that the police officers knew that the allegedly false statements were actually false or that they acquiesced to them. Additionally, Defendant has not demonstrated that "the confidential informant acted on anything other than his or her own initiative in providing the information to law enforcement." *Hollis*, 245

F.3d at 674 (noting that the defendant did not show "that the informant had a public-spirited, as opposed to self-serving, reason for providing those statements to law enforcement"). Thus, even if the CI's statements that were included in the affidavit for the search were intentionally or recklessly false, it would not be sufficient to warrant a *Franks* hearing.

Defendant's final objection with respect to the Magistrate Judge's denial of a *Franks* hearing deals with the Magistrate Judge's characterization of Defendant's testimony regarding whether he sold drugs from his home as "obviously self-serving." (R&R, doc. #38, p.21). While this Court agrees with Magistrate Judge Medler's characterization,[15] the Court finds that even if the truthfulness of Defendant's testimony were assumed, the outcome would not change. As set forth in the preceding paragraph, statements of a non-governmental informant cannot be the sole basis for a *Franks* hearing. Here, the non-governmental informant told police that Defendant was selling drugs from his house. If this informant's information were in fact false, Defendant would still not be entitled to a *Franks* hearing.

Thus, the Court concludes that Magistrate Judge Medler's findings with respect to Defendant's Motion for a *Franks* Hearing were correct, and the Court rejects Defendant's Motion.

**B.      MOTION TO SUPPRESS EVIDENCE**

With respect to Defendant's Motion to Suppress Evidence, Magistrate Judge Medler determined that the only issue before the court was the allegation that the search warrant was executed before it was actually signed. The Magistrate Judge reasoned that the other grounds

---

[15]Particularly, the Court notes that Defendant's testimony that he never sold drugs from his home is called into question because Defendant did not know the names, addresses, or telephone numbers of any of his buyers.

raised by Defendant were unsupported by the evidence in the record or simply not at issue. This Court agrees, but must address one issue that was apparently challenged by Defendant in his Objections to the Report and Recommendation. Specifically, Defendant objects to the Magistrate Judge's finding that the physical presence of the search warrant is not necessary at the location of the search. The Court finds that the Magistrate Judge correctly determined that the search warrant need not be physically present. *See United States v. Hepperle*, 810 F.2d 836, 839 (8th Cir. 1987) ("Nothing in the fourth amendment or Rule 41 requires that the search warrant be physically present prior to commencing the search."). Defendant also includes in his Objection various statements regarding the motives of the police officers and the possible presence of a crow bar. Defendant fails to show how either of these topics are relevant to the issue of whether the search warrant had to be physically present when it was executed. Thus, Defendant's objection as to this issue is rejected.

1.    **TIMELINE OF EVENTS**

The vast majority of Defendant's Objections regarding Magistrate Judge Medler's denial of his Motion to Suppress deal with the Magistrate Judge's findings regarding the timeline of events on October 28, 2008, specifically, whether officers conducted a search of Defendant's house before the search warrant was signed at 3:53 p.m. The Court is presented with two different versions of the facts of this case.

Defendant's version of the facts is that he left his house around 3:15 or 3:20 p.m. and was stopped shortly thereafter by the police. The police took him back to his house and they arrived at about 3:30 p.m. At that time, the officers began searching his house, prior to the issuance of the search warrant (at 3:53 p.m.). Other officers arrived with a search warrant at 4:15 p.m. and

an officer arrived with a dog later. Defendant's version of the facts is corroborated by several witnesses. Terry Peebles testified that: he and Defendant left Defendant's house around 3:15 or 3:20 p.m; they were stopped by the police about three minutes later; the stop lasted about ten minutes total; police took Defendant and let Mr. Peebles leave; Mr. Peebles called his wife but didn't reach her (consistent with cell phone records that indicate a one minute call to Mrs. Peebles' cell phone at 3:38 p.m. and a one minute call to the Peebles' residence at 3:39 p.m.); he stopped a few blocks away to talk to his cousin Keith Conway for about three minutes; his wife called him and he talked to her as he drove back to Defendant's house (consistent with cell phone records that indicate a seven minute call from Mrs. Peebles' cell phone to Mr. Peebles' cell phone); he called his wife as he walked up to Defendant's house (consistent with cell phone records that indicate a two minute call to Mrs. Peebles' cell phone at 3:56 p.m.); and when he arrived at Defendant's house, there were uniformed officers present. Kathy Peebles confirmed the telephone calls Terry Peebles discussed. Eric Petty testified that: he saw Defendant leave in Terry Peebles' truck at 3:10 p.m.; about five minutes later, he saw Peter Doss return to the house; at 3:25-3:30 p.m., several vehicles with tinted windows arrived and some men went inside Defendant's house; the Berkley Police arrived sometime thereafter; at about 4:10 or 4:15 p.m., a Dodge Charger arrived and the occupants had a brown envelope; and at 4:35 p.m., the drug canine arrived. Peter Doss testified that: he returned to Defendant's house at 3:15 p.m.; about five minutes later, the police arrived; the police officers went inside Defendants house, taking Defendant with them, while Mr. Doss remained on the porch; about thirty minutes later, he identified some marijuana as his and was told to leave; and at 5:30 or 6:00 p.m., he returned, finding that the police officers were still there.

The Government's version of the facts is that Defendant did not leave his house until after the search warrant had been signed at 3:53 p.m. The officers stopped Defendant a few blocks from his house, and the officers then returned with him to his house. They did not initially conduct a search because they were waiting for the drug canine to arrive. The Government's version of the facts is corroborated by several witnesses. Detective Ronald Willenbrink testified that: the search warrant was signed at 3:53 p.m.; after the search warrant was signed, Detective Davis used the all-call feature of his Nextel phone to alert the other members of the M.E.G. Unit; while they were filing the search warrant, members of the Unit called to say that Defendant was leaving his residence; and they did not arrive at Defendant's house until about 4:15 p.m. Detective Jeff Seerey testified that: after they received notification from Detective Davis that the search warrant had been signed, the officers observed Defendant get into a car with Terry Peebles and drive away; the officers pulled the car over about two or three blocks away; the detention lasted about two or three minutes, then they returned to Defendant's house with Defendant (which took about one or one and a half minutes); upon arriving, the officers observed the presence of another car, which was later determined to belong to Peter Doss; at 4:06 p.m., he called the Berkley dispatcher, stating that they were ready to execute the search warrant and they wanted uniformed officers to respond; a protective sweep was completed first, then the canine sweep, then finally the search of Defendant's residence; and Defendant was brought inside after the canine sweep. Police Officer Brian Hale testified that: while at his home, he received a call requesting a canine sweep; it took him about five or six minutes to get ready to leave; at 4:19 p.m., he left his house and called his dispatcher, who logged him out at 16:19:04 (or 4:19 p.m.); he arrived at Defendant's house about five or ten minutes later; when he arrived, it did not appear

that a search had taken place; and he did an initial protective sweep of the residence and then completed the canine sweep.

Although the Court agrees with the Magistrate Judge that "it is factually a <u>very</u> close call," (R&R, doc. #38, p.27), the Court finds that the Government's version of the facts is slightly more credible. While both Parties presented reliable testimony in support of their argument, there are a few facts that cause the Court to find in the Government's favor. First, Terry Peebles clearly testified that when he returned to Defendant's house, there were uniformed officers present. According to Mr. Peebles' testimony, he returned to Defendant's house around 3:55 or 3:56 p.m. However, the recording of the Berkley dispatcher audio traffic definitively establishes that the uniformed Berkley police officers were not requested until 4:06 p.m. Thus, the uniformed officers could not have been present at 3:55 or 3:56 p.m., as Mr. Peebles testified. Not only does this discrepancy call into question the credibility of Mr. Peebles' testimony, but the recorded 4:06 p.m. dispatch call stating that they were ready to execute the search warrant is an independent record that corroborates the Government's version of the events.

Additionally, another record that supports the Government's version of the events is the Hazelwood Incident Report, showing that the dispatcher logged Police Officer Hale out at 4:19 p.m. This establishes that the canine sweep could not have occurred before 4:19 p.m. Considering that the standard police practice is to wait until the canine sweep is complete before searching a residence for narcotics, it appears that the actual search did not occur until some time after 4:19 p.m. This conclusion is supported by Officer Hale's testimony that when he arrived to perform the canine sweep, it did not appear that a search had taken place.

Finally, the Nextel records,[16] which set forth the telephone activity of various members of the M.E.G. Unit, are consistent with the Government's version of the events, and are not consistent with Defendant's version of the events. First, according to Defendant's version of the events, he was stopped and arrested by Detective Seerey and another officer sometime between 3:20 and 3:30 p.m. However, during this period of time, Detective Seerey made and received several phone calls: a 36.9 direct connect call from Detective Haenel at 3:21 p.m.; a 21.9 second all-call to the other officers at 3:22 p.m.; a 30.7 direct connect call to Detective Davis at 3:23 p.m.; a 26.3 second all-call to the other officers at 3:26 p.m.; a 25.3 second direct connect call from Detective Counterman at 3:28 p.m.; a 110 second phone call to an undisclosed number at 3:30 p.m.; and a 118 second phone call to another undisclosed number at 3:32 p.m. With all of these incoming and outgoing phone calls, it is difficult to believe that Detective Seerey also had time to stop and arrest Defendant, not to mention engage in the abusive conduct alleged by Defendant. Additionally, the calls reflected in the Nextel records after 3:30 p.m. do not support Defendant's theory that the officers began searching his house at that time. Specifically, there are various all-calls and direct connect calls between the officers that were at the scene between 3:30 p.m. and 3:53 p.m. If they were conducting a search together at that time, there would be no

---

[16]In his Objections to Magistrate Judge Medler's Report and Recommendation, Defendant makes various arguments about the unavailability of the Nextel records during the evidentiary hearing. At the time of the evidentiary hearing, Defendant's Motion to Order Production of Nextel Phone Records [doc. #14] was still pending. The Government opposed this Motion. Ultimately, but after the evidentiary hearing, the Government released the Nextel phone records, rendering Defendant's Motion moot. While it would have been preferable to have the Nextel phone records available at the time of the evidentiary hearing so that the officers could have answered questions about the records, this Court was able to discern the information it required from the records without additional explanation. To the extent that Defendant seeks an additional hearing to address these phone records, his request is denied.

need to utilize the all-call or direct connect features on their phones.[17]  These calls are more consistent with surveillance activity.

On the other hand, the Nextel records corroborate the Government's version that Defendant was stopped and arrested after the search warrant was signed.  First, the two short all-calls from Detective Davis at 3:54 p.m. appear to be the calls in which he notified the other officers that the search warrant had been signed.  Detective Willenbrink testified that while he and Detective Davis were in the Clerk's office filing the signed search warrant, they received a call informing them that Defendant had left his residence.  This is consistent with the 28.9 second direct call from Detective Seerey to Detective Davis at 3:57 p.m.  Additionally, there was a series of all-calls made by Detective Seerey after his call to Detective Davis, suggesting that he was keeping the other officers apprised of the pursuit of Defendant and the initial stop of the vehicle.  Between 3:57 p.m. and 4:06 p.m., when Detective Seerey requested Berkley officers in uniform, there was sufficient time for Detective Seerey to complete the stop (which he asserts took two or three minutes) and make the one or one and one half minute trip back to Defendant's house.[18]  Finally, the all-calls and direct calls between the officers stop after 4:09 p.m., which is consistent

---

[17]One call in particular warranted an objection from Defendant: the 334 second call that Detective Seerey made at 3:49 p.m. to an undisclosed number.  The Government asserts that this call was made to Ameren UE to determine if Defendant was moving out of the house, after Detective Seerey observed activity suggesting that he might be.  Defendant objects to this characterization, as this issue was not raised or addressed at the evidentiary hearing.  Defendant also suggests that this undermines the veracity of the application for a search warrant.  This Court disagrees.  Ascertaining whether Defendant was planning to move from his current residence has no impact on the existence of probable cause for the search warrant.  Further, regardless of who the call was to, it seems unlikely that Detective Seerey would make a five and one half minute phone call while he was supposedly searching Defendant's house.

[18]Particularly, the Court notes that the Nextel records reflect that there was no telephone activity initiated by Detective Seerey between 4:01 p.m. and 4:05 p.m.

with the Government's theory that by this time, the officers were returning to Defendant's house to prepare for the search. With all officers present or on their way, there was no need to utilize the all-call or direct call functions.

As a result of the foregoing, the Court has determined that the Government's version of the facts is slightly more credible and the Court concludes that the search warrant was signed before Defendant left his house and before the search was conducted. Thus, Defendant's Objections that encompass the timeline issue, particularly Objections 19-23, are rejected.

## 2.    INDEPENDENT SOURCE AND INEVITABLE DISCOVERY

Magistrate Judge Medler alternatively determined that the evidence should not be suppressed under either the independent source rule or the inevitable discovery rule. Defendant objected to these findings of the Magistrate Judge, arguing that neither rule applies when there is evidence of bad faith conduct on the part of the police officers. Specifically, Defendant cites to the search warrant application and the execution of the search warrant to support his argument. This Court's finding that the search warrant had been signed before it was executed renders moot the issue of whether the independent source rule or inevitable discovery rule applies. However, the Court notes that there is no evidence of bad faith conduct on the part of the police officers in this case. In the *Franks* hearing analysis, the Court rejected Defendant's argument that Officer Willenbrink intentionally or recklessly included false information in the affidavit offered in support of the search warrant. Additionally, by concluding that the search warrant had been signed before the officers executed the search warrant, the Court dispelled Defendant's argument that there was bad faith in the execution of the search warrant. Thus, the Court rejects Defendant's bad faith

argument and adopts Magistrate Judge Medler's independent source and inevitable discovery analysis.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Byron Anthony Wright's Motion for a *Franks* Hearing [doc. #24] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Byron Anthony Wright's Motion to Suppress Evidence [doc. #22] is **DENIED**.

Dated this <u>4th</u> Day of <u>September</u>, 2009.


E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE